FTB:AP/ML/RSB
F. #2021R00987

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

BRIAN CASTRO,
       also known as "Morenaje,"
MUSAH COWARD,
       also known as "General Mecka,"
    "Red" and "The General Red," and
CHARLES POWELL,
    also known as "Payback,"

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 21-CR-572 (S-1) (EK)

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrés Palacio
Megan Larkin
Raffaela S. Belizaire
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

RELEVANT BACKGROUND ............................................................................ 1

   I.    The Offense Conduct ....................................................................... 1

   II.   ██████ ............................................................................................ 3

   III.  The Defendants' Arrests and Indictment ..................................... 6

        A.   Powell's Arrest and Initial Indictment ................................ 6

        B.   Coward's Federal Arrest in New Jersey on Unrelated Charges ................ 7

        C.   The Superseding Indictment .................................................. 8

ARGUMENT ................................................................................................... 8

   I.    Evidence of a 911 Call is Admissible ............................................ 8

        A.   Applicable Law ....................................................................... 9

            1.   The Business Records Exception ..................................... 9

            2.   Present Sense Impressions ............................................... 9

            3.   Excited Utterances ........................................................... 10

        B.   The Court Should Admit the 911 Call .................................. 11

   II.   Body-Worn Camera Footage From NYPD Officers is Admissible ...................... 13

   III.  Autopsy Photographs and Video Recordings of Maxwell After Being Shot are Admissible .............................. 16

   IV.  ██████████████████████████ ................................................... 18

        A.   ███████████ ......................................................................... 18

        B.   ██████ ..................................................................................... 20

   V.   ███████████████████████████ ................................................ 23

   VI.  ███████████████████████████ .............................................. 24

        A.   ████████ ............................................................................... 24

        B.   ██████ ..................................................................................... 30

1.  ███████████████████████████ .......................................... 31

2.  ███████████████████████████ .......................................... 35

VII.    Evidence of the Defendants' Access to Firearms is Admissible ......................... 37

    A.    Applicable Law .................................................................. 38

    B.    Discussion ......................................................................... 40

VIII.   Other Evidence Relevant to the Civic Used in the Robbery is Admissible ......................................................................... 42

IX.     Evidence of Powell's Flight from Law Enforcement After His Apprehension is Admissible .................................................. 42

    A.    Applicable Law .................................................................. 43

    B.    Discussion ......................................................................... 44

X.      The Court Should Preclude Evidence of the Defendants' Exculpatory Statements .......................................................... 47

XI.     The Government May Cross-Examine the Defendants About Their Prior Convictions if They Testify at Trial .................................. 48

    A.    Applicable Law .................................................................. 49

    B.    Discussion ......................................................................... 50

XII.    Certain Business and Public Records Certifications Are Admissible ................. 51

XIII.   The Court Should Preclude Any Evidence Introduced by the Defendants Seeking to Elicit Sympathy .................................... 55

XIV.    The Court Should Preclude Any Evidence Relating to Possible Punishment and Collateral Consequences ................................. 57

XIV.    The Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits to Be Introduced During Their Case-in-Chief .................... 58

CONCLUSION .......................................................................................... 62

## TABLE OF AUTHORITIES

### CASES

Crawford v. Washington,
    541 U.S. 36 (2004)................................................................................................. 12

Davis v. Washington,
    547 U.S. 813 (2006)........................................................................................13, 16

Giglio v. United States,
    405 U.S. 150 (1972)............................................................................................... 35

Melendez-Diaz v. Massachusetts,
    557 U.S. 305 (2009)......................................................................................... 52, 53

Old Chief v. United States,
    519 U.S. 172 (1997)..................................................................................... 17, 29, 33

Parker v. Reda,
    327 F.3d 211 (2d Cir. 2003) .................................................................................. 9

Porterfield v. Alaska,
    145 P.3d 613 (Alaska Ct. App. 2006)................................................................... 22

Quartararo v. Hanslmaier,
    186 F.3d 91 (2d Cir. 1999) .................................................................................. 16

Rivers v. Smith,
    No. 13-CV-00549 (NGG), 2015 WL 8489963 (E.D.NY. Dec. 8, 2015) ............... 22

Shannon v. United States,
    512 U.S. 573 (1994)............................................................................................... 57

Tyson v. Dep't of Energy & Env't Prot.,
    No. 21-CV-736 (JAM), 2024 WL 489329 (D. Conn. Feb. 8, 2024) ...................... 40

United States v. Aiyaswamy,
    No. 15-CR-568 (LHK), 2017 WL 1365228 (N.D. Cal. Apr. 14, 2017) ................... 61

United States v. Alimehmeti,
    284 F. Supp. 3d 477 (S.D.N.Y. 2018) ................................................................... 23

United States v. Al-Sadawi,
    432 F. 3d 419 (2d Cir. 2005) .......................................................................... 43, 44

United States v. Amuso,
    21 F.3d 1251 (2d Cir. 1994) ........................................................................... 44, 45

United States v. Anderson,
    575 F. Supp. 31 (S.D.N.Y. 1983) ................................................................. 45

United States v. Arroyo,
    600 F. App'x 11 (2d Cir. 2015) .................................................................. 39

United States v. Ashburn,
    No. 11-CR-303 (NGG), 2015 WL 588704 (E.D.N.Y. Feb. 11, 2015) ................... 31

United States v. Ayala,
    307 F.2d 574 (2d Cir. 1962) ............................................................... 44, 45

United States v. Barris,
    377 F. App'x 93 (2d Cir. 2010) ................................................................ 38

United States v. Barret,
    No. 10-CR-809 (KAM), 2011 WL 6704862 (E.D.N.Y. Dec. 21, 2011) ............. 25, 26

United States v. Basciano,
    No. 03-CR-929 (NGG), 2006 WL 385325 (E.D.N.Y. Feb. 17, 2006) ................... 34

United States v. Battaglia,
    No. 05-CR-774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan. 15, 2008) ................... 55

United States v. Blume,
    967 F.2d 45 (2d Cir. 1992) ...................................................................... 58

United States v. Brown,
    254 F.3d 454 (2d Cir. 2001) ...............................................................12, 15

United States v. Buigues,
    568 F.2d 269 (2d Cir. 1978) .................................................................... 46

United States v. Bumagin,
    136 F. Supp. 3d 361 (E.D.N.Y. 2015) ......................................................... 41

United States v. Burden,
    600 F.3d 204 (2d Cir. 2010) .................................................................... 22

United States v. Cadieux,
    500 F.3d 37 (1st Cir. 2007) .................................................................... 13

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) ................................................................ 24, 25

United States v. Colon,
    880 F.2d 650 (2d Cir. 1989) .................................................................... 27

United States v. Coonan,
   938 F.2d 1553 (2d Cir. 1991) ..................................................... 25, 33

United States v. Crumble,
   No. 18-CR-32 (ARR), 2018 WL 2016852 (E.D.N.Y. May 1, 2018) ....................................... 41

United States v. Daly,
   842 F.2d 1380 (2d Cir. 1988) ..................................................... 25

United States v. Davidson,
   308 F. Supp. 2d 461 (S.D.N.Y. 2004) .................................................. 47

United States v. Delligatti,
   No. 15 CR. 491 (KBF), 2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018) ...................... 35, 36, 37

United States v. Deluna,
   38 F. App'x 644 (2d Cir. 2002) ..................................................... 18

United States v. Diallo,
   461 F. App'x 27 (2d Cir. 2012) .................................................. 44, 46

United States v. Diaz,
   176 F.3d 52 (2d Cir. 1999) ........................................................ 26

United States v. DiMarzo,
   80 F.3d 656 (1st Cir. 1996) ....................................................... 58

United States v. Dupree,
   870 F.3d 62 (2d Cir. 2017) ..................................................... 18, 20

United States v. Ellis,
   460 F.3d 920 (7th Cir. 2006) ...................................................... 53

United States v. Estrada,
   430 F.3d 606 (2d Cir. 2005) ..................................................... 49, 50

United States v. Everett,
   825 F.2d 658 (2d Cir. 1987) .................................................. 26, 28, 34

United States v. Farhane,
   634 F.3d 127 (2d Cir. 2011) ....................................................... 22

United States v. Feliz,
   467 F.3d 227 (2d Cir. 2006) ....................................................... 12

United States v. Frappier,
   807 F.2d 257 (1st Cir. 1986) ...................................................... 17

United States v. Garcia,
    291 F.3d 127 (2d Cir. 2002) ......................................................................... 26

United States v. Gelzer,
    50 F.3d 1133 (2d Cir. 1995) ......................................................................... 29

United States v. Germosen,
    139 F.3d 120 (2d Cir. 1998) .................................................................... 26, 27

United States v. Goffer,
    721 F.3d 113 (2d Cir. 2013) ......................................................................... 27

United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997) .................................................................... 25, 33

United States v. Guerrero,
    882 F. Supp. 2d 463 (S.D.N.Y. 2011) .................................................. 29, 31, 36

United States v. Guerrier,
    511 F. Supp. 3d 556 (M.D. Pa. 2021) ........................................................... 51

United States v. Gupta,
    747 F.3d 111 (2d Cir. 2014) ......................................................................... 19

United States v. Harris,
    491 F.3d 440 (D.C. Cir. 2007) ..................................................................... 56

United States v. Harris,
    733 F.2d 994 (2d Cir. 1984) ......................................................................... 28

United States v. Hawkins,
    59 F.3d 723 (8th Cir. 1995) ......................................................................... 10

United States v. Hayes,
    553 F.2d 824 (2d Cir. 1997) ......................................................................... 50

United States v. Holden,
    No. 13-CR-444 (AJB), 2015 WL 1514569 (D. Or. Mar 19, 2015) ...................... 61

United States v. Holt,
    460 F.3d 934 (7th Cir. 2006) .................................................................. 35, 37

United States v. Hossain,
    No. 19-CR-606 (SHS), 2021 WL 4272827 (S.D.N.Y. Sept. 21, 2021).................. 23

United States v. Hsia,
    No. 98-CR-0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) ...................... 59

United States v. Inserra,
    34 F.3d 83 (2d Cir. 1994) ........................................................................... 25

United States v. Jackson,
    No. 19-CR-356 (ARR), 2020 WL 7060141 (E.D.N.Y. Dec. 2, 2020) ...................................... 39

United States v. James,
    712 F.3d 79 (2d Cir. 2013) ........................................................................... 12

United States v. Jefferys,
    No. 18-CR-359 (KAM), 2019 WL 5103822 (E.D.N.Y. Oct. 11, 2019) ...................... 43, 44, 45

United States v. Johnson,
    688 F.3d 494 (8th Cir. 2012) ........................................................................ 53

United States v. Jones,
    299 F.3d 103 (2d Cir. 2002) .................................................................... 10, 12

United States v. Kaiser,
    609 F.3d 556 (2d Cir. 2010) ........................................................................... 9

United States v. Kandic,
    No. 17-CR-449 (NGG), 2022 WL 1266431 (E.D.N.Y. Apr. 28, 2022) .................................... 23

United States v. Khan,
    591 F. Supp.2d 202 (E.D.N.Y. 2008) ............................................................ 25

United States v. Komasa,
    767 F.3d 151 (2d Cir. 2014) ........................................................................ 53

United States v. Langford,
    990 F.2d 65 (2d Cir. 1993) ......................................................................... 25

United States v. Larkin,
    No. 12-CR-319 (GWF), 2015 WL 4415506 (D. Nev. July 20, 2015) .................................... 61

United States v. Lauria,
    541 F. Supp. 3d 311 (S.D.N.Y. 2021) .......................................................... 40

United States v. Levy,
    731 F.2d 997 (2d Cir. 1984) .................................................................. 26, 27

United States v. Lewis,
    110 F.3d 417 (7th Cir. 1997) ....................................................................... 58

United States v. Lin,
    505 F. App'x 10 (2d Cir. 2012) .................................................................... 20

United States v. Livoti,
196 F.3d 322 (2d Cir. 1999) ................................................................ 30

United States v. Malka,
602 F. Supp. 3d 510 (S.D.N.Y. 2022) ................................................ 19

United States v. Malpeso,
115 F.3d 155 (2d Cir. 1997) ................................................................ 56

United States v. Marin,
669 F.2d 73 (2d Cir. 1982) .................................................................. 47

United States v. Martinez,
311 Fed. App'x 378 (2d Cir. 2008) .................................................... 15

United States v. Matera,
489 F.3d 115 (2d Cir. 2007) ................................................................ 26

United States v. Mejia-Valez,
855 F. Supp. 607 (E.D.N.Y. 1994) ....................................... 9, 10, 15, 34

United States v. Michel,
879 F. Supp. 2d 291 (E.D.N.Y. 2012) ................................................ 54

United States v. Mickens,
926 F.2d 1323 (2d Cir. 1991) .............................................................. 27

United States v. Miller,
641 F. Supp. 2d 161 (E.D.N.Y. 2009) ................................................ 55

United States v. Morgan,
505 F.3d 332 (5th Cir. 2007) .............................................................. 53

United States v. Morillo-Vidal,
547 F. App'x 29 (2d Cir. 2013) .......................................................... 28

United States v. Moten,
564 F.2d 620 (2d Cir. 1977) ................................................................ 28

United States v. Napout,
No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .................................................. 60

United States v. Ortiz,
857 F.2d 900 (2d Cir. 1988) ................................................................ 27

United States v. Osborne,
739 F. App'x 11 (2d Cir. 2018) .......................................................... 16

United States v. Paccione,
    949 F.2d 1183 (2d Cir. 1991) ................................................................. 55

United States v. Pastore,
    No. 18-2482, 2022 WL 2068434 (2d Cir. June 8, 2022)........................ 36

United States v. Paulino,
    445 F.3d 211, 223 (2d Cir. 2006) ...................................................... 16, 30

United States v. Persico,
    645 F.3d 85 (2d Cir. 2011) ..................................................................... 19

United States v. Pike,
    292 F. App'x 108 (2d Cir. 2008) ............................................................ 19

United States v. Pipola,
    83 F.3d 556 (2d Cir. 1996) ......................................................... 27, 31, 34

United States v. Pitre,
    960 F.2d 1112 (2d Cir. 1992) ......................................................... 26, 33

United States v. Qualls,
    613 F. App'x 25 (2d Cir. 2015) .............................................................. 53

United States v. Quattrone,
    441 F.3d 153 (2d Cir. 2006) ................................................................... 29

United States v. Ramirez,
    894 F.2d 565 (2d Cir. 1990) ................................................................... 27

United States v. Ramos,
    No. 22-CR-431 (LJL), 2023 WL 9002868 (S.D.N.Y. 2023)................... 15

United States v. Ravich,
    421 F.2d 1196 (2d Cir. 1970) ................................................................. 39

United States v. Robinson,
    560 F.2d 507 (2d Cir. 1977) ................................................................... 39

United States v. Rom,
    528 F. App'x 24 (2d Cir. 2013) .............................................................. 54

United States v. Romanello,
    No. 22-CR-194 (EK), 2023 WL 8283435, at *3 (E.D.N.Y. Nov. 27, 2023)........................... 20

United States v. Rosa,
    11 F.3d 315 (2d Cir. 1993) ..................................................................... 28

United States v. Russo,
    302 F.3d 37 (2d Cir. 2002) ................................................................ 20

United States v. Saget,
    377 F.3d 223 (2d Cir. 2004) ........................................................ 19, 22

United States v. Salim,
    189 F. Supp. 2d 93 (S.D.N.Y. 2002) .................................................. 16

United States v. Santos,
    541 F.3d 63 (2d Cir. 2008) ................................................................ 33

United States v. Sasso,
    59 F.3d 341 (2d Cir. 1995) ................................................................ 19

United States v. Schlesinger,
    372 F. Supp. 2d 711 (E.D.N.Y. 2005) ................................................ 43

United States v. Schlussel,
    No. 08-CR-694 (JFK), 2009 WL 413605 (S.D.N.Y. Feb. 11, 2009) ...................... 45

United States v. Scott,
    No. 21-CR-429 (AT), 2022 WL 1026725 (S.D.N.Y. Apr. 5, 2022) .................... 40

United States v. Shoup,
    476 F.3d 38 (1st Cir. 2007) ............................................................... 10

United States v. Slaughter,
    248 F. App'x 210 (2d Cir. 2007) ....................................................... 38

United States v. Smith,
    727 F.2d 214 (2d Cir. 1984) .............................................................. 34

United States v. Smothers,
    No. 20-CR-213 (KAM), 2023 WL 348870 (E.D.N.Y. Jan. 20, 2023) ................... 60

United States v. Steele,
    216 F. Supp. 3d 317 (S.D.N.Y. 2016) ................................................. 10

United States v. Steele,
    390 F. App'x 6 (2d Cir. 2010) ............................................... 43, 44, 45, 46

United States v. Stratton,
    779 F.2d 820 (2d Cir. 1985) .............................................................. 20

United States v. Suggs,
    625 F. Supp. 3d 428 (E.D. Pa. 2022) ................................................. 40

United States v. Swenson,
   298 F.R.D. 474 (D. Idaho 2014) ...................................................................... 60, 61

United States v. Taylor,
   767 F. Supp. 2d 428 (S.D.N.Y. 2010) ................................................................. 39

United States v. Thai,
   29 F.3d 785 (2d Cir. 1994) ............................................................................. 24, 26

United States v. Thomas,
   116 F.3d 606 (2d Cir. 1997) ................................................................................. 58

United States v. Thomas,
   214 F. Supp. 3d 187 (E.D.N.Y. 2016) ................................................................. 50

United States v. Thomas,
   453 F.3d 838 (7th Cir. 2006) ............................................................................... 13

United States v. Tocco,
   135 F.3d 116 (2d Cir. 1998) ................................................................................. 11

United States v. Towne,
   870 F.2d 880 (2d Cir. 1989) ........................................................................... 24, 25

United States v. Triumph,
   266 F. App'x 53 (2d Cir. 2008) ........................................................................... 43

United States v. Tyrell,
   840 F. App'x 617 (2d Cir. 2021) ......................................................................... 19

United States v. Van Hise,
   No. 12-CR-847 (PGG), 2013 WL 6877319 (S.D.N.Y. Dec. 31, 2013) ................. 22

United States v. Vasquez,
   840 F. Supp. 2d 564 (E.D.N.Y. 2011) ................................................................. 50

United States v. Velazquez,
   246 F.3d 204 (2d Cir. 2001) ................................................................................. 16

United States v. Watts,
   934 F. Supp. 2d 451 (E.D.N.Y. 2013) ................................................................. 57

United States v. Weeks,
   716 F.2d 830 (11th Cir. 1983) ............................................................................. 25

United States v. Weiland,
   420 F.3d 1062 (9th Cir. 2005) ............................................................................. 53

United States v. White,
    312 F. Supp. 3d 355 (E.D.N.Y. 2018) ............................................................ 50

United States v. Williams,
    205 F.3d 23 (2d Cir. 2000) ........................................................................... 27

United States v. Williams,
    506 F.3d 151 (2d Cir. 2007) ......................................................................... 19

United States v. Williams,
    526 F. App'x 29 (2d Cir. 2013) .................................................................... 41

United States v. Yeley-Davis,
    632 F.3d 673 (10th Cir. 2011) ...................................................................... 53

United States v. Yuan Li,
    No. 18-CR-302 (BMC), 2020 WL 6393038 (E.D.N.Y. Nov. 2, 2020) ............. 11, 14

United States v. Zappola,
    677 F.2d 264 (2d Cir. 1982) ......................................................................... 39

Williams v. Vahey,
    No. 20-CV-2560 (KAM), 2023 WL 130834 (E.D.N.Y. Jan. 8, 2023) ................... 62

Zafiro v. United States,
    506 U.S. 534 (1993) ...................................................................................... 29

## STATUTES

18 U.S.C. § 371 .................................................................................................. 7

18 U.S.C. § 922(g) ......................................................................................... 6, 7

18 U.S.C. § 924(c) ................................................................................... 7, 8, 38

18 U.S.C. § 924(j) ............................................................................................. 8

18 U.S.C. § 1951(a) ......................................................................................... 8

## RULES

Fed. R. Crim. P. 16 ......................................................................................... 59

Fed. R. Crim. P. 26.2 ...................................................................................... 62

Fed. R. Evid. 401 ....................................................................................... 55, 57

Fed. R. Evid. 402 ....................................................................................... 23, 55

Fed. R. Evid. 403 ................................................................................................... 23, 29, 55, 56

Fed. R. Evid. 404(b) ................................................................................................. 24, 26, 38

Fed. R. Evid. 405(a) ........................................................................................................... 55

Fed. R. Evid. 609 ..................................................................................................... 49, 50, 51

Fed. R. Evid. 801 ............................................................................................................ 20, 47

Fed. R. Evid. 803(1) ............................................................................................................... 9

Fed. R. Evid. 803(2) ....................................................................................................... 10, 11

Fed. R. Evid. 803(6) ............................................................................................... 11, 52, 54

Fed. R. Evid. 804 ........................................................................................................... 18, 20

RELEVANT BACKGROUND[1]

I.     The Offense Conduct

As set forth in greater detail below, on the evening of October 7, 2020, the defendants carried out an armed robbery inside an illegal gambling spot located at 181 Hegeman Avenue in Brownsville, Brooklyn (the "Gambling Spot").  The defendants were driven to that location from New Jersey by the defendant Musah Coward ("Coward").  After arriving in Brooklyn, the defendants Charles Powell ("Powell"), Brian Castro ("Castro) ██ ██ ███ ████████████ entered the Gambling Spot as Coward waited outside in the car as the robbery took place.  During the course of that robbery, Powell and Castro both shot Rodney Maxwell ("Maxwell"), who had been providing security for the Gambling Spot and who later died from his gunshot wounds.

The Gambling Spot was divided into three rooms, with the front room (the "Front Room") facing Hegeman Avenue.  A middle room (the "Middle Room") led into a back room (the "Back Room") that contained the card and craps tables where gambling took place.  The Back Room opened into a backyard patio area with overgrown grass (the "Backyard").

Cell site records for all three defendants showed them assembled in the same general area in Paterson, New Jersey on the evening of the shooting.  Later that night, cell site activity for Powell and Coward showed their travel from New Jersey into New York City and south toward Brooklyn where the Gambling Spot was located.  Their cell site activity also roughly

---

[1]     The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial.  In addition, the proffer of facts set forth in this motion as to any witness's anticipated testimony is a collection of the sum and substance of the witness's anticipated testimony and does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce through the respective witness's anticipated testimony.

coincided with license plate reader ("LPR") hits for a black Honda Civic (the "Civic") [2] driven by Coward as it traveled toward Brooklyn.

Surveillance video from a residential location on Osborne Street (the "Osborne Street Video") captured the Civic parking around the corner from the Gambling Spot approximately twenty minutes before the shooting. The Osborne Street Video then showed Castro, Powell, ███ ███ standing around the Civic. The Osborne Street Video also captured the three men, after standing by the Civic for some time, walking around the corner toward the Gambling Spot in a single-file line led by Powell, followed by Castro, ███████ ████.

Surveillance video from the front door of the Gambling Spot captured Powell, Castro ███ ███ entering the Gambling Spot (in that order) through the Front Room. Video in the Front Room captured Powell and Castro walking through the Middle Room toward the Back Room. As they walked from the Front Room into the Middle Room, Maxwell began to fight with ███ in an apparent effort to disarm ███. During that struggle, Maxwell ███ ███ ended up back in the Front Room, where the fight was captured on video. The Gambling Spot did not have surveillance video in the Middle and Back Rooms.

Moments later, Castro ran into the Front Room where Maxwell ███ ███ were fighting, shot Maxwell once in the back at close range and then fled the Gambling Spot. Despite being shot in the back, Maxwell continued to struggle with ███. Meanwhile, in the Backyard, which also had surveillance video, Powell indiscriminately fired into a crowd of individuals running from the Back Room into the Backyard as they desperately attempted to escape the

---

[2] The Civic was registered to Coward's girlfriend, Maxine A. Wallace, under New Jersey license plate N50LJP with an associated address of 319 Park Avenue in Paterson, New Jersey where Coward resided with Wallace.

location.  Three men were shot non-fatally in and around the Backyard and were later treated at local hospitals.  During the course of the robbery, one or more of Powell, Castro ██ ██ stole cash from people in attendance at the Gambling Spot.

After firing at the individuals fleeing from the Gambling Spot, Powell ran into the Front Room, where Maxwell continued to struggle with ██ despite the gunshot wound to Maxwell's back.  Powell then fired at Maxwell's chest at close range.  Powell fled the Gambling Spot, ████████████████ ███  The shot fired by Powell immediately incapacitated Maxwell, and he fell to the ground.  Maxwell was taken to a local hospital that evening, where he died.  Surveillance video from the Front Room captured the shots fired at Maxwell by Castro and Powell.

The Osborne Street Video captured Castro and Powell running back to the Civic immediately after shooting Maxwell.  They fled with Coward (the driver) ████████████ ████████  Cell site activity for Powell and Coward showed their travel from Brooklyn back to Paterson, New Jersey.  Once again, their cell site activity roughly coincided with LPR hits for the Civic used by Coward as it traveled back to Paterson.  After returning to Paterson, cell site activity for all three defendants showed them assembled in the same general vicinity in Paterson.

II.    ██

██████████████████████████

█████████████████████████████

███████████████████████

---

[3] ██████████████████████

█████████████████████████████







III.    The Defendants' Arrests and Indictment

    A.    Powell's Arrest and Initial Indictment

On October 7, 2021, the Honorable Peggy Kuo, United States Magistrate Judge, authorized a complaint and arrest warrant charging Powell with being a felon in possession of ammunition, in violation of Title 18, United States Code, Section 922(g).  See ECF No. 1.

On October 15, 2021, police in Clifton, New Jersey responded to a car accident in which Powell was involved.  Powell told personnel from the Clifton Fire Department that he wanted to be examined for possible injuries.  After running Powell's driver's license number, responding police realized that Powell was wanted on a warrant.  Powell was advised of the warrant, detained and transported to St. Mary's Hospital in Passaic, New Jersey for medical evaluation.

After Powell underwent X-rays and a CAT scan, he was advised by hospital personnel that he did not have any injuries and would be discharged from the hospital.  Powell then asked a nurse if he could go to the bathroom because, he stated, that if he were not permitted to go, it was "gonna just come out of [his] ass."  Surveillance video from the hospital captured two officers escorting Powell to the bathroom, where they removed his handcuffs.  After Powell used the bathroom, and as the officers were about to re-handcuff him, the same video captured Powell shoving past one of the officers and sprinting towards a rear exit door of the hospital.  Additional police units responded to search for Powell.  Later that day, he was located within a few blocks from the hospital and was turned over to the FBI, pursuant to the federal warrant.

Powell was arraigned on the federal complaint on October 18, 2021 and ordered detained.  See ECF No. 3.  On November 15, 2021, a grand jury sitting in this district returned a single-count indictment charging Powell with the same crime initially charged in the complaint— being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g).  See ECF No. 6.

B.    <u>Coward's Federal Arrest in New Jersey on Unrelated Charges</u>

On October 1, 2022, Coward was arrested in his home at 319 Park Avenue in Paterson, New Jersey pursuant to a federal complaint filed in the District of New Jersey on September 29, 2022, charging Coward with violations of 18 U.S.C. §§ 371 (conspiracy to unlawfully sell firearms) and 922(g)(1) (possession of a firearm by a convicted felon).  See 22-MJ-15251 (DNJ).  The complaint alleged, in pertinent part, that on June 21, 2022, Coward sold a loaded 9mm Taurus firearm and extra ammunition to a CHS in Paterson, New Jersey, who was acting at the direction of the FBI, in exchange for approximately $1,100.  The complaint also alleged that on June 27, 2022, Coward sold a loaded .40 Glock firearm to the same CHS in Paterson, New Jersey in exchange for approximately $1,100.  Both of the controlled sales were audio and video recorded.  ███████████████████

When law enforcement agents arrested Coward at his home on October 1, 2022, they recovered a quantity of heroin from his bedroom; a loaded .40 Glock firearm underneath his mattress; and multiple boxes containing numerous rounds of ammunition.  Agents also observed Coward's Civic, used in the commission of the instant crime, parked in a gas-station parking lot across the street from Coward's house.

On December 18, 2023, based on the conduct outlined above, a grand jury sitting in the District of New Jersey returned an indictment charging Coward with violations of 18 U.S.C. §§ 922(g)(1) (possession of a firearm by a convicted felon), 841(a)(1) and (b)(1)(C) (distribution and possession with intent to distribute heroin) and 924(c)(1)(A)(i) (possession of a firearm in furtherance of a drug trafficking crime).  See 23-CR-1067 (CPO) (DNJ).  That indictment is currently pending in the District of New Jersey.

C.    The Superseding Indictment

On March 13, 2023, a grand jury in this district returned an indictment against the defendants charging them with Hobbs Act robbery conspiracy and substantive Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and the firearm-related murder of Maxwell, in violation of 18 U.S.C. § 924(j)(1).  See ECF No. 78.  The superseding indictment also carried over the original count charging Powell with being a felon in possession of ammunition.

Powell was arraigned on the superseding indictment on March 15, 2023.  See ECF No. 82.

Castro was arraigned on the superseding indictment on March 16, 2023.  See ECF No. 85.  At that time, Castro was incarcerated on unrelated state sentences in Passaic County, New Jersey, stemming from convictions for third-degree possession of a weapon in connection with a stabbing and second-degree unlawful possession of a weapon in connection with a gun recovered from Castro in Paterson, New Jersey.

Coward was arraigned on the superseding indictment on March 22, 2023.  See ECF No. 92.  Coward was in custody at the time on the pending federal charges in the District of New Jersey.

ARGUMENT

I.    Evidence of a 911 Call is Admissible

Four 911 calls were made after the robbery and shooting at the Gambling Spot.  The government moves for admission at trial of one of the four 911 calls, which has been previously produced with Bates-number CP000364, in which the caller reported that multiple individuals had been shot and requested immediate medical assistance for them.  The 911 call is admissible as a

business record under Rule 803(6) of the Federal Rules of Evidence.  It is also admissible as a

present sense impression under Rule 803(1) and an excited utterance under Rule 803(2).

    A.    <u>Applicable Law</u>

    1.    <u>The Business Records Exception</u>

Federal Rule of Evidence 803(6) provides that the following items "are not excluded

by the hearsay rule":

> A memorandum, report, record, or data compilation, in any form, of
> acts, events, conditions, opinions, or diagnoses, made at or near the
> time by, or from information transmitted by, a person with
> knowledge, if kept in the course of a regularly conducted business
> activity, and if it was the regular practice of that business activity to
> make the memorandum, report, record or data compilation . . . .

"Business records are made reliable by 'systematic checking, by regularity and

continuity which produce habits of precision, by actual experience of business in relying upon

them, or by duty to make an accurate record as part of a continuing job or occupation.'"  <u>Parker v.

Reda</u>, 327 F.3d 211, 214-15 (2d Cir. 2003) (<u>quoting</u> Fed. R. Evid. 803(6) advisory comm. note).

Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value

at all."  <u>United States v. Kaiser</u>, 609 F.3d 556, 574 (2d Cir. 2010) (citation and quotation marks

omitted).

    2.    <u>Present Sense Impressions</u>

Rule 803(1) of the Federal Rules of Evidence provides an exception to the general

rule against hearsay for any statement "describing or explaining an event or condition, made while

or immediately after the declarant perceived it."  Fed. R. Evid. 803(1).  "By its own terms,

application of Rule 803(1) has three distinct requirements: i) the statement must describe or explain

the event perceived; ii) the declarant must have in fact perceived the event described; and iii) the

description must be 'substantially contemporaneous' with the event in question."  <u>United States v.</u>

Mejia-Valez, 855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted).  Because "in many, if not most, instances precise contemporaneity is not possible, . . . a slight lapse is allowable between the event perceived and the declarant's statement."  Id. (citation and internal quotation marks omitted omitted).  "[T]here is no per se rule indicating what time interval is too long."  Id. (citation and internal quotation marks omitted).

The reason for this exception is twofold.  First, the immediacy requirement reduces the opportunity for reflection and thus minimizes the likelihood of deception or fabrication on the part of the declarant.  Second, immediacy also reduces the likelihood that the declarant will have inaccurately remembered the event in question.  See United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002) ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory.").

Courts have routinely found 911 calls to be present sense impressions.  See United States v. Steele, 216 F. Supp. 3d 317, 322 (S.D.N.Y. 2016) (admitting 911 call as present sense impression or excited utterance); see also id. (citing United States v. Shoup, 476 F.3d 38, 42 (1st Cir. 2007) (admitting 911 call made one or two minutes following event); United States v. Hawkins, 59 F.3d 723, 730 (8th Cir. 1995) (911 call made within seven minutes of the event sufficiently contemporaneous to be a present sense impression), vacated on other grounds, 516 U.S. 1168 (1996)).

3.    Excited Utterances

Rule 803(2) of the Federal Rules of Evidence provides another exception to the rule against hearsay for excited utterances.  An excited utterance is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).  To qualify as an excited utterance, the proponent of an out-of-court statement must establish the following: (i) that a startling event occurred; (ii) that the declarant made the

statement while under the stress of the excitement caused by the startling event; and (iii) that the declarant's statement relates to the startling event. See United States v. Brown, 254 F.3d 454, 458 (2d Cir. 2001).

"The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).

B.    The Court Should Admit the 911 Call

As an initial matter, the 911 recording itself falls within the "business record" exception to the general prohibition on hearsay evidence. See Fed. R. Evid. 803(6); United States v. Yuan Li, No. 18-CR-302 (BMC), 2020 WL 6393038, at *12 (E.D.N.Y. Nov. 2, 2020) (noting that "911 emergency phone call[s] . . . . are regularly admitted into evidence as business records.") (citations omitted).  Further, the statements made on the 911 call that the government seeks to admit are not testimonial and fall within two exceptions to the general bar against hearsay. Specifically, the statements made during the 911 call constitute both present sense impressions under Rule 803(1) of the Federal Rules of Evidence and excited utterances under Rule 803(2) of the Federal Rules of Evidence.

The 911 call—placed within minutes of the shooting—is a classic present sense impression of a declarant explaining an event that had just transpired in his immediate presence. The caller reported the incident moments after it occurred for the purpose of obtaining medical assistance for the individuals who had been shot by the perpetrators.  Specifically, the caller reported that "people got shot" and requested an ambulance right away.  When asked about the medical state of the individuals who were shot, he responded, "they're alive, don't let them die!" and repeatedly asked the 911 call operator to "hurry up!"  He then received medical instructions

11

from the 911 call operator not to move any of the individuals who were shot and how to tend to bleeding wounds as they waited for an ambulance.  The caller's statements are straightforward and clear, and there is no indicia the statements were deceptive or calculated for an ulterior purpose; this was a routine 911 call summoning help.  See Jones, 299 F.3d at 112 ("Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." (citation omitted)).

Moreover, the call is admissible as an excited utterance under Rule 803(2).  First, a startling event had occurred—again, a violent shooting at a Gambling Spot where multiple individuals were hit by gunfire.  Second, the caller was still under the stress of the event during the call, shouting and exasperated in his desperate requests for help.  Third, the caller's statements related to the startling event at issue, namely, that multiple individuals had been shot and needed immediate medical assistance as a result.  Accordingly, the 911 call satisfies all three elements for admission of the statements as an excited utterance.  See Brown, 254 F.3d at 458.

Finally, the admission of the 911 call does not offend the Confrontation Clause of the Sixth Amendment.  The Confrontation Clause prohibits the government from introducing "testimonial" statements by a non-testifying declarant unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant.  See Crawford v. Washington, 541 U.S. 36, 68-69 (2004).  A statement is "testimonial," such that it "trigger[s] the protections of the Confrontation Clause," only "when it is made with the primary purpose of creating a record for use at a later criminal trial."  United States v. James, 712 F.3d 79, 96 (2d Cir. 2013).  The admission of "nontestimonial" statements does not violate the Confrontation Clause.  See, e.g., United States v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006) (holding that "the Confrontation Clause simply has no application to nontestimonial statements").

12

In <u>Davis v. Washington</u>, 547 U.S. 813 (2006), the Supreme Court held that admission of a declarant's statements to a 911 operator did not violate the Confrontation Clause because "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." <u>Id.</u> at 823; <u>see also</u> <u>id.</u> at 827 ("A 911 call, . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance."); <u>United States v. Cadieux</u>, 500 F.3d 37, 41-42 (1st Cir. 2007) (holding that "statements recorded during the 911 call are nontestimonial hearsay"); <u>United States v. Thomas</u>, 453 F.3d 838, 843-44 (7th Cir. 2006) (holding that an anonymous caller's statements to 911 operator that "'[t]here's a dude that just got shot . . . ,' and that 'the guy who shot him is still out there'" were nontestimonial). Nothing about the 911 call here provides a reason to depart from this precedent; the call was a typical 911 interaction intended to summon an ambulance for individuals who had just been shot and needed medical attention.

For the foregoing reasons, the 911 call should be admitted at trial.

II.    <u>Body-Worn Camera Footage From NYPD Officers is Admissible</u>

The government intends to introduce at trial body-worn camera footage of two NYPD officers (out of the fifteen officers equipped with body-worn cameras who responded to the scene): Officers Stephen Rice and Thomas Turner. Officer Rice's body-worn camera footage depicts his walking into the Gambling Spot within approximately ten minutes of the shooting and observing Maxwell on the ground. Officer Rice instructs individuals from the Gambling Spot to speak to Maxwell, performs chest compressions on Maxwell, and assists with putting Maxwell into an ambulance. Officer Rice then walks through the various rooms of the Gambling Spot to the Backyard before re-entering the Gambling Spot, observing shell casings on the ground, and

speaking to a witness, who reports that there was a shooting inside.  Officer Turner's body-worn camera footage depicts his walking through the Gambling Spot to the Backyard, where two non-fatal victims are observed on the ground; the victims state to Officer Turner that they had been shot. Specifically, when asked what happened, one of the non-fatal victims reports that "somebody ran in here and just starting shooting."  Officer Turner then informs the non-fatal victims that an ambulance is on the way, re-enters the Gambling Spot, and speaks to other NYPD officers about the location of shell casings on the ground.

The government seeks to introduce this limited subset of body-worn camera footage to demonstrate the layout of the Gambling Spot, the location of ballistic evidence, the location of the victims after the shooting, the victims' accounts of what happened moments after the shooting (as both present sense impressions and excited utterances), and the injuries sustained as a result of the shooting.  The body-worn camera footage will also corroborate anticipated witness testimony about the circumstances surrounding the shooting and will assist the jury in understanding evidence regarding the layout of the Gambling Spot.

Similar to the above analysis of the admissibility of the 911 call, the body-worn camera footage is admissible as a business record under Rule 803(6) of the Federal Rules of Evidence because (1) the recordings were made contemporaneously when the events recorded took place; (2) the recordings were kept in the regular course of the NYPD's business; (3) making such recordings is the regular practice of the NYPD; (4) Officers Rice and Turner (or an NYPD custodian of body-worn camera) can testify as to the conditions under which the recordings took place; and (5) there is no indication of a lack of trustworthiness.  Yuan Li, 2020 WL 6393038, at *12 (applying the rubric for 911 calls to contemporaneous law enforcement recordings).

The statements made on the body-worn camera footage are also admissible as present sense impressions under Rules 803(1) of the Federal Rules of Evidence and excited

14

utterances under Rule 803(2) of the Federal Rules of Evidence.  As outlined above, Rule 803(1)

"has three distinct requirements: i) the statement must describe or explain the event perceived;

ii) the declarant must have in fact perceived the event described; and iii) the description must be

'substantially contemporaneous' with the event in question." Mejia-Valez, 855 F. Supp. at 613.

Here, the relevant statements made by witnesses occurred within 15 minutes after the shooting

while the victims were still suffering on the ground and awaiting medical assistance.  Further, given

that the defendants were still at-large, the statements were intended to assist NYPD officers as they

responded to an active crisis.  There are no indicia that the statements were deceptive or made for

any purpose other than to respond to an ongoing emergency.

   The statements made on the body-worn camera footage are also admissible as

excited utterances under Rule 803(2).  First, as with the 911 call, a startling event had occurred in

which multiple people, including some of the declarants, had been shot.  Second, the declarants

were still under the stress of the event when they spoke to NYPD officers—two of the non-fatal

victims were on the ground suffering from gunshot wounds, and the other witness, though not shot,

had moments earlier observed others being shot and fleeing for their lives.  Courts in this Circuit

have recognized that violent events are more likely to generate the kind of stress and excitement

that persist for long periods of time.  See United States v. Ramos, No. 22-CR-431 (LJL), 2023 WL

9002868 (S.D.N.Y. 2023) (body-worn camera footage of victim's statement after a robbery

admissible as an excited utterance); United States v. Martinez, 311 Fed. App'x 378, 380-81 (2d Cir.

2008).  Third, the declarants' statements related to the startling event at issue—namely, the

shooting and resulting injuries.  Accordingly, the statements on the body-worn camera footage

satisfy all three elements for admission as an excited utterance.  See Brown, 254 F.3d at 458.

   Moreover, the questions asked by NYPD officers on the body-worn camera footage

should be admitted because they are being offered as context for the responses given by the

<div align="center">15</div>

witnesses and non-fatal victims, not for their truth. See United States v. Paulino, 445 F.3d 211, 216 (2d Cir. 2006). Further, most of the NYPD officers' statements were questions, which are not hearsay under Rule 801(c), because they are not "assertions." See Quartararo v. Hanslmaier, 186 F.3d 91, 98 (2d Cir. 1999) ("An inquiry is not an assertion, and accordingly is not and cannot be a hearsay statement.") (citation and internal quotation marks omitted).

Finally, admitting the body-worn camera footage does not run afoul of the Confrontation Clause because, similar to the analysis above with respect to the 911 call, the statements were nontestimonial and were made to seek medical attention and assist NYPD officers during an emergency. See Davis, 547 U.S. at 823 (finding that statements are nontestimonial when made in the course of police interrogation for primary purpose of enabling police assistance to meet an ongoing emergency).

III.    Autopsy Photographs and Video Recordings of Maxwell After Being Shot are Admissible

The government intends to introduce at trial a limited number of autopsy photographs and limited body-worn camera footage and video surveillance depicting Maxwell's physical state immediately after being shot before medical personnel arrived at the scene.

The Second Circuit has made clear that the graphic nature of autopsy photographs does not alone render them inadmissible. See United States v. Salim, 189 F. Supp. 2d 93, 98 (S.D.N.Y. 2002) (collecting cases). The analysis of admissibility "hinges upon whether the photograph is relevant to the resolution of some disputed point in a trial or otherwise aids a jury in a factual determination." Id. Courts have routinely admitted autopsy photographs where the jury must make factual determinations about a death. See United States v. Osborne, 739 F. App'x 11, 18 (2d Cir. 2018) (affirming admission of autopsy photographs and concluding that they were "plainly relevant" where the government had to prove the murder and noting that the "fact that the photos might have been graphic [did] not render them unfairly prejudicial"); United States v.

16

Velazquez, 246 F.3d 204, 211 (2d Cir. 2001) (admission of autopsy photographs showing extent of bruising were "relevant to the conduct constituting the offenses committed"); see also United States v. Frappier, 807 F.2d 257, 262 (1st Cir. 1986) (noting that autopsy photographs "were not egregiously shocking; most if not all of them bore reference to medical testimony and corroborated [witness's] account of the murder.").

In this case, there were approximately 172 autopsy photographs taken of Maxwell. The government intends to introduce a small subset of these photographs to demonstrate the location of Maxwell's injuries. The government also intends to admit video surveillance depicting Maxwell in the approximately 10 minutes after being shot as he awaited medical assistance and limited body-worn camera footage depicting NYPD officers rendering first aid to Maxwell and transferring him to an ambulance.

These photographs and video recordings will corroborate anticipated witness testimony regarding how Maxwell was killed and will assist the jury in understanding evidence related to Maxwell's cause of death. The autopsy photographs are also necessary to assist the medical examiner in her testimony regarding, among other things, the entrance and exit locations of the two gunshot wounds, evidence that the shots were made in close range, and the blunt-force injuries suffered by Maxwell. This evidence is an essential part of this case and proof of the charges.

The government has substantially limited the number of autopsy photographs and amount of body-worn camera footage it intends to offer to minimize any potential prejudice and ensure that the evidence is not cumulative of other evidence. This evidence, even where other pieces of evidence may corroborate or establish certain facts, are squarely admissible in criminal cases. See generally Old Chief v. United States, 519 U.S. 172, 182 (1997).

IV. 













VI.


28





1. 













VII.    <u>Evidence of the Defendants' Access to Firearms is Admissible</u>

The government intends to introduce evidence relating to the defendants' access to firearms before and after the charged murder. [12] ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████ law enforcement agents recovered a .40 caliber Glock handgun underneath Coward's mattress in his home at the time of his arrest on October 1, 2022.

The government also intends to introduce evidence of the defendants' access to and facility with firearms before and after the charged murder through digital evidence recovered from each of their iCloud accounts. Specifically, with respect to Powell, the government anticipates

---

[12] On June 3, 2024, the government advised the defendants that it seeks to introduce this evidence as directly relevant to the crimes charged in the indictment, and, alternatively as 404(b) evidence. <u>See</u> ECF No. 177.

introducing the following evidence from his iCloud account: (1) photos and videos of firearms (including photos and videos of Powell in possession of firearms) in the two months prior to the murder; (2) photos and videos of firearms (including photos and videos of Powell in possession of firearms) in the year following the murder; and (3) text threads with Coward regarding malfunctioning firearms from approximately July 2021 and October 2021.

With respect to Castro, the government anticipates introducing the following evidence from his iCloud account: (1) photos and videos of firearms (including photos and videos of Castro in possession of firearms) between approximately May 2019 and October 2020; (2) at least one photo of a firearm from late-October 2020, after the murder; and (3) and text threads with unknown individuals regarding firearms from approximately May 2020 and July 2020.

With respect to Coward, the government anticipates introducing photos of firearms between approximately April 2021 and July 2021 from Coward's iCloud account.

This evidence is directly relevant to the charged conduct, and its probative value is not substantially outweighed by the danger of unfair prejudice. Alternatively, this evidence is relevant under Fed. R. Evid. 404(b) to show such things as motive, opportunity, intent, preparation, and knowledge, as well as to corroborate key evidence.

A.    <u>Applicable Law</u>

The Second Circuit has repeatedly recognized that evidence of a defendant's prior possession of firearms is admissible as direct evidence or pursuant to Federal Rule of Evidence 404(b) as going to the issues of opportunity, absence of mistake and to demonstrate a defendant's ability to access firearms. <u>See, e.g.</u>, <u>United States v. Barris</u>, 377 F. App'x 93, 95 (2d Cir. 2010) (affirming admission "of evidence concerning [defendant's] prior arrest and conviction for firearms possession" in § 924(c) prosecution "because it was relevant to the firearms possession charged" and had "obvious probative value"); <u>United States v. Slaughter</u>, 248 F. App'x 210, 212 (2d Cir.

2007) ("Evidence showing that a defendant possessed a handgun prior to the charged crime is properly admitted to show access to such a weapon."); United States v. Zappola, 677 F.2d 264, 270 (2d Cir. 1982) (holding that it was not error to admit testimony that the defendant possessed a handgun six months before he was alleged to have fired a handgun during the charged crime because such evidence "was properly admitted as probative of his access to such a weapon."); United States v. Ravich, 421 F.2d 1196, 1204 (2d Cir. 1970) (finding no error in admitting evidence of firearms and ammunition recovered from the defendants following their arrest, in part, because "[d]irect evidence of such possession would have been relevant to establish opportunity or preparation to commit the crime charged . . . ."); United States v. Jackson, No. 19-CR-356 (ARR), 2020 WL 7060141, at *1 (E.D.N.Y. Dec. 2, 2020) (holding that evidence concerning a defendant's possession of a handgun from an earlier conviction for criminal possession of a weapon was "probative of access" in a prosecution for the defendant's unlawful possession of a similar handgun); United States v. Taylor, 767 F. Supp. 2d 428, 438 (S.D.N.Y. 2010) (finding that the defendant's "prior gun possession is directly relevant to the issue of opportunity and absence of mistake and also to demonstrate [defendant's] ability to access such a weapon.").

Courts in the Second Circuit have also upheld the introduction of evidence that a defendant possessed firearms, which postdated the charged conduct to establish opportunity and access. See, e.g., United States v. Arroyo, 600 F. App'x 11, 13-14 (2d Cir. 2015) (finding that a defendant's possession of a firearm less than seven months after charged drug sales was "certainly relevant to show that he had an opportunity to possess a gun at the time of those sales."); United States v. Robinson, 560 F.2d 507 (2d Cir. 1977) (en banc) (where a cooperating witness testified that the defendant possessed a .38-caliber gun (or what appeared to be a .38-caliber gun) during a bank robbery, evidence that the defendant was in possession of a .38 caliber gun ten weeks later upon arrest was relevant, in part, on the grounds that it tended to show that the defendant had the

opportunity to commit the bank robbery); see also Tyson v. Dep't of Energy & Env't Prot., No. 21-CV-736 (JAM), 2024 WL 489329, at * 3 (D. Conn. Feb. 8, 2024) (permitting introduction of firearms possession occurring a year after alleged acts of intimidation and finding that "[a]fter arising events 'may well be relevant if they retrospectively shed light on the significance and nature of acts that are within the temporal scope of the complaint.'").

     B.   <u>Discussion</u>

As detailed above, the defendants had ready access to firearms (before and after the murder), as evidenced by digital evidence from their iCloud accounts (photos, videos and text threads). This evidence is proof of the charged crimes in that it establishes the defendants' opportunity to access guns in and around the time of the murder. See United States v. Suggs, 625 F. Supp. 3d 428, 441-42 (E.D. Pa. 2022) (admitting messages related to the defendant's gun possession from his iPhone because they showed the defendant's opportunity to possess a firearm under Rule 404(b)); United States v. Scott, No. 21-CR-429 (AT), 2022 WL 1026725, at *11 (S.D.N.Y. Apr. 5, 2022) (admitting a photo sent via text message from a cell phone seized from the defendant allegedly depicting him in a face mask with a semi-automatic firearm within two weeks of a shooting to prove the defendant's identity as the shooter); United States v. Lauria, 541 F. Supp. 3d 311, 316-17 (S.D.N.Y. 2021) (admitting photos and videos from the defendants' Apple iCloud accounts to show that they had access to firearms in around the time of the charged robberies).

At a bare minimum, evidence of Powell's access to and possession of firearms is directly relevant to his Section 922(g) charge—the original charge on the indictment. All of the firearms-related photos, videos and messages identified on Powell's iCloud account post-date his 2016 felony-gun-possession conviction in New Jersey after which he was prohibited from possessing firearms as a convicted felon.



Coward's immediate access to firearms is ████ underscored by the firearm
and ammunition recovered from his bedroom following his arrest on October 1, 2022, which
corroborates evidence of his role as the distributor of firearms.

Admitting the evidence outlined above would not be unduly prejudicial to the
defendants.  Their possession and access to firearms is not more inflammatory than the present
offense, which involves opening fire at innocent individuals during the robbery of the Gambling
Spot and killing one of those individuals.  See United States v. Bumagin, 136 F. Supp. 3d 361, 370
(E.D.N.Y. 2015) (concluding that a prior robbery plan and the defendant's possession of firearms
"are no 'more sensational or disturbing' than the Hobbs Act robbery conspiracy, illegal use of a
firearm, felon in possession of ammunition, and felon in possession of ammunition crimes with
which [he] is charged").  In any event, any prejudice that might exist can be mitigated by a limiting
instruction to the jury that it may not consider evidence of the defendants' gun possession as
propensity evidence and may only consider it for opportunity, intent, preparation, knowledge,
absence of mistake and access to firearms.  See United States v. Williams, 526 F. App'x 29, 35 (2d
Cir. 2013) (no undue prejudice where "the court administered an appropriate limiting instruction");
United States v. Crumble, No. 18-CR-32 (ARR), 2018 WL 2016852, at *4 (E.D.N.Y. May 1, 2018)
("[T]o the extent that the jury could possibly construe this evidence as establishing [the
defendant]'s propensity . . . a proper limiting instruction as to the limited purposes for which this

evidence is being introduced can dispel this potential prejudice."). Accordingly, evidence of the defendants' access to firearms is admissible at trial.

VIII.    Other Evidence Relevant to the Civic Used in the Robbery is Admissible

The government intends to introduce evidence that Coward was stopped by the Port Authority Police on March 4, 2020 as he drove the Civic. Coward was arrested after a traffic stop but the government only seeks to introduce evidence of the stop itself, and not the underlying conduct that led to the stop or arrest, to link Coward to the same Civic driven by him on the evening of the shooting at the Gambling Spot. As referenced above, the Civic is registered to Maxine Wallace and not to Coward. To establish the relationship between Wallace and Coward (boyfriend/girlfriend), the government intends to introduce into evidence a redacted YouTube video in which Coward performed a song called "My Lady Freestyle" in which he acknowledges that "Maxine Wallace" is "[his] lady" and "[his] baby," which was previously produced with Bates-number CP_308267.

The government intends to introduce this evidence to show Coward's connection with the Civic that was used before and after the murder and his relationship with the registered owner of the Civic, Maxine Wallace. This evidence is plainly relevant to the issue of identification and the government has reduced the risk of prejudice by omitting any reference to Coward's arrest after the traffic stop.

IX.    Evidence of Powell's Flight from Law Enforcement After His Apprehension is Admissible

The government seeks to introduce evidence, including witness testimony and video surveillance footage, describing and showing Powell's flight from law enforcement after learning that there was a warrant for his arrest and that he would be taken into custody. This evidence is highly probative of his knowledge and consciousness of guilt and, consequently, his actual guilt.

As discussed earlier, Powell was involved in a car accident in Clifton, New Jersey on October 15, 2021.  After he was informed of an active warrant, Powell was detained and transported for treatment for injuries he reported to law enforcement.  After medical treatment at the hospital, Powell was informed by law enforcement that he would be taken into custody pursuant to the warrant.  Powell asked to go to the bathroom and was escorted there by police officers.  When Powell exited the bathroom, before law enforcement officers could re-handcuff him, Powell sprinted down the hospital hallway toward a rear exit door and down several flights of stairs until he successfully fled the hospital.  He was found hours later hiding in a nearby alleyway.

The government intends to introduce testimony from law enforcement officers regarding Powell's traffic accident, transportation to the hospital, escape from the hospital, and eventual apprehension.  The government also intends to offer video surveillance footage from the hospital depicting the officers escorting Powell to the bathroom, removing his handcuffs, and, upon his exit from the bathroom, fleeing from the officers.

A.    Applicable Law

The Second Circuit has repeatedly held that "[f]light evidence is admissible to show consciousness of guilt" regarding the charged conduct.  United States v. Triumph, 266 F. App'x 53, 55 (2d Cir. 2008); see also United States v. Steele, 390 F. App'x 6, 12 (2d Cir. 2010) (noting that it is "today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself"); United States v. Jefferys, No. 18-CR-359 (KAM), 2019 WL 5103822, at *13 (E.D.N.Y. Oct. 11, 2019) (same); see also United States v. Schlesinger, 372 F. Supp. 2d 711, 724 (E.D.N.Y. 2005) ("flight has been described as the consummate act of evasion") (citations omitted); United States v. Al-Sadawi, 432 F. 3d 419, 424 (2d Cir. 2005) ("Flight is an admission by conduct.").

43

Thus, "[t]he government may introduce evidence of flight to demonstrate consciousness of guilt if a series of inferences can be drawn 'from which the jury can infer consciousness of guilt from flight.'"  United States v. Diallo, 461 F. App'x 27, 30 (2d Cir. 2012) (quoting Al-Sadawi, 432 F. 3d at 424)); see also Steele, 390 F. App'x at 11.  In Al-Sadawi, the Second Circuit held that the admissibility of flight evidence depends upon the degree of confidence with which a court can draw four inferences: "(1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."  432 F.3d at 424.

That a defendant's flight is subject to varying interpretations does not preclude the admission of flight evidence.  Rather, "[w]here the evidence passes the threshold inquiry of relevance, 'the accepted technique is for the judge to receive the evidence and permit the defendant to bring in evidence in denial or explanation.'"  United States v. Amuso, 21 F.3d 1251, 1258 (2d Cir. 1994) (quoting United States v. Ayala, 307 F.2d 574, 576 (2d Cir. 1962)); see also Jefferys, 2019 WL 5103822 at *13.

B.    Discussion

The Court should admit evidence of Powell's flight and apprehension.  All four inferences stated in Al-Sadawi are supported by the evidence in this case.

First, there can be little dispute that the defendant's conduct constitutes flight from law enforcement.  After asking to use the restroom, Powell sprinted away from officers before they were able to put handcuffs back on him and ran through a busy hospital and out an exit door.  He then hid until he was found by law enforcement officers in a nearby alleyway.

The second and third inferences stated in Al-Sadawi are also established.  The defendant fled from law enforcement after being taken into custody by law enforcement and

44

notified of a warrant for his arrest. He was also held for an extended period of time as local law enforcement officers tried to figure out what his arrest status was and, once in the hospital, he was told he would not be going home and would instead be taken into custody. These circumstances support an inference that the defendant was fleeing not for some trivial reason, but because he was aware that he was guilty of criminal conduct and wanted to avoid being held accountable for it. Thus, the evidence supports the inference that he was fleeing due to consciousness of guilt and that his guilt was for the charged crimes.[13]

Finally, Powell—as one of the participants in the charged crimes by robbing individuals at the Gambling Spot and shooting Maxwell—clearly had personal knowledge of his guilt, which is not only relevant but probative of his actual guilt. See Jefferys, 2019 WL 5103822 at *13 (finding that an inference that there was a nexus between the defendant's consciousness of guilt and actual guilt "appears to be met by virtue of the inherent relationship between consciousness of guilt and actual guilt"); Steele, 390 F. App'x at 12 (noting that it is "universally conceded that the fact of an accused's flight . . . [is] admissible as evidence of consciousness of guilt, and thus of guilt itself"); United States v. Schlussel, No. 08-CR-694 (JFK), 2009 WL 413605, at *3 (S.D.N.Y. Feb. 11, 2009) (admitting evidence of consciousness of guilt as probative of actual guilt); United States v. Anderson, 575 F. Supp. 31, 33 (S.D.N.Y. 1983) (holding that statements

---

[13]    Though Powell may argue that he was fleeing due to having committed other crimes, and thus his consciousness of guilt related to those crimes rather than the crimes charged, the evidence also supports an inference that his flight was due to consciousness of guilt for the crimes charged given the delay between the accident and being transported to the hospital, which supports an inference that law enforcement officers were checking about other charges, and the conversations between law enforcement officers in which it was decided Powell would be taken into custody. Even where varying interpretations for the defendant's flight exist, the Court should "'receive the evidence and permit the defendant to bring in evidence in denial or explanation.'" Amuso, 21 F.3d at 1258 (quoting United States v. Ayala, 307 F.2d 574, 576 (2d Cir. 1962)); see also Jefferys, 2019 WL 5103822 at *13.

made by the defendant were relevant under Rule 401 because "they support the inference of consciousness of guilt which in turn supports an inference of actual guilt" (citing United States v. Buigues, 568 F.2d 269, 273 (2d Cir. 1978)). [14]  Thus, the evidence concerning Powell's flight from officers in the hospital after being taken into custody and notified about a warrant is highly probative of the issues of state of mind and personal knowledge of his guilt, which in turn is probative of his actual guilt.

Notably, the Second Circuit has previously upheld admission of evidence concerning flight from law enforcement in circumstances where the evidence supporting the four inferences was substantially weaker than in this case.  See, e.g., Diallo, 461 F. App'x at 30 (upholding admission of evidence of the defendant's flight where the government established that the defendant requested a travel visa to Sierra Leone after learning of the charges against him but did not introduce any direct evidence that the defendant's intent was to flee from law enforcement authorities or that his flight concerned the specific charges at issue); Steele, 390 F. App'x at 11 (upholding admission of evidence of the defendant's flight from law enforcement officers who attempted to arrest him in his apartment despite the government producing no direct evidence tying this flight to the defendant's consciousness of guilt concerning the specific crime charged, and despite the fact that the defendant proffered an alternative explanation for his flight).

For the foregoing reasons, the government should be permitted to admit evidence relating to Powell's flight as probative of his knowledge and consciousness of guilt as to the charged crime.  The government should also be permitted to argue to the jury that Powell's consciousness of guilt is also probative of his actual guilt.

---

[14]    For the same reasons, evidence of Powell's flight is also admissible under Rule 404(b) to show his knowledge and consciousness of guilt of the crime charged.

X.    <u>The Court Should Preclude Evidence of the Defendants' Exculpatory Statements</u>

Should the defendants seek to introduce or elicit testimony concerning any of their own statements, the government moves to preclude them from doing so.

Although statements made by the defendants that are relevant to the charged crimes are admissible and not hearsay if "offered against an opposing party and . . . made by the party in an individual or representative capacity," Fed. R. Evid. 801(d)(2)(A), a defendant is generally prohibited from introducing his own out-of-court statements at trial.  <u>See</u> <u>United States v. Marin</u>, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible.").  A defendant may not elicit his own statements as an "attempt to get [his] side of the . . . story in front of the jury without him[self] testifying and opening him[self] up to cross-examination."  <u>United States v. Davidson</u>, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004).

Here, there is no legal basis for the defendants to introduce evidence of their own statements.  If offered for their truth, such statements are non-admissible hearsay, and, as stated in further detail below, to the extent the statements are not offered for their truth or were made after they were initially arrested, such statements are also irrelevant to the issues in this case. Accordingly, although the government does not intend to admit the defendants' statements at trial, the government moves to preclude any separate attempts by the defendants to elicit their own out-of-court statements unless they testify and offer an appropriate basis for admission of such statements.

XI.    The Government May Cross-Examine the Defendants About Their Prior Convictions if
       They Testify at Trial

Should the defendants testify at trial, the government seeks to cross-examine them

regarding certain of their prior criminal convictions.  The prior convictions are probative of the

defendants' character for truthfulness.

Defendant Powell

On September 26, 2016, Powell pled guilty to second-degree
unlawful possession of a handgun, a felony, in violation of New
Jersey Penal Law § 2C:39-5B(1), and was sentenced on June 23,
2017 to three years' imprisonment.  In this case, Powell was arrested
on May 27, 2016, after being found in possession of an illegal .40
caliber Hi-Point firearm.

Defendant Castro

On October 8, 2021, Castro pled guilty to second-degree unlawful
possession of a handgun, a felony, in violation of New Jersey Penal
Law § 2C:39-5B(1), and was sentenced on February 28, 2023 to three
years' imprisonment.  On March 17, 2021, police officers responded
to a report of shots fired in Paterson, New Jersey, stopped Castro, and
recovered a fully loaded .38 caliber firearm from his waistband.

On August 10, 2021, Castro pled guilty to fourth-degree unlawful
possession of a weapon, a felony, in violation of New Jersey Penal
Law § 2C:39-5D, in connection with a stabbing, and was sentenced
on February 28, 2023 to 19 months' imprisonment.

Defendant Coward

On April 7, 2022, Coward pled guilty to third-degree manufacturing,
distributing or dispensing a controlled substance, a felony, in
violation of New Jersey Penal Law §§ 2C:35-5A(1), 2C:35-5B(3),
and was sentenced on April 29, 2022 to two years' probation with
time served of 176 days.

On February 5, 2018, Coward pled guilty to fourth-degree resisting
arrest, a felony, in violation of New Jersey Penal Law § 2C:29-2A(2),
and was sentenced on August 17, 2018 to two years' probation.

48

On May 15, 2017, Coward pled guilty to third-degree terroristic threats, a felony, in violation of New Jersey Penal Law § 2C:12-3A, and was sentenced on June 19, 2017 to two years' probation.

On July 14, 2014, Coward pled guilty to fourth-degree manufacture, transport, disposition and defacement of weapons and dangerous instruments, a felony, in violation of New Jersey Penal Law § 2C:39-9D, and was sentenced on July 24, 2015 to three years' probation with jail credit of 574 days.

On July 22, 2013, Coward pled guilty to third-degree distribution of a controlled substance within 1,000 feet of school property, a felony, in violation of New Jersey Penal Law § 2C:35-7, and was sentenced to three years' probation with time served credit of 81 days.

On June 2, 2011, Coward pled guilty to third-degree possession, use or being under the influence, or failure to make lawful disposition, a felony, in violation of New Jersey Penal Law § 2C:35-10(a), and was sentenced to three years' probation with time served credit of 42 days.

On August 16, 2010, Coward pled guilty to third-degree aggravated assault, a felony, in violation of New Jersey Penal Law § 2C:12-1B(7), and was sentenced to 270 days' imprisonment and two years' probation.

A.    Applicable Law

Federal Rule of Evidence 609(a)(1) provides that when a defendant testifies as a witness, for purposes of impeachment, evidence of "a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year . . . must be admitted . . . if the probative value of the evidence outweighs its prejudicial effect to that defendant." Fed. R. Evid. 609(a)(1)(B). The Rule contemplates that all felony convictions, regardless of their nature, are probative of a witness's credibility. See United States v. Estrada, 430 F.3d 606, 617 (2d Cir. 2005) (Sotomayor, J.).

The Rule further provides that "for any crime, regardless of punishment, the evidence must be admitted if the Court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R.

Evid. 609(a)(2).  This is because crimes involving dishonesty are considered "per se probative of credibility."  See Estrada, 430 F.3d at 615.

If more than ten years have passed since the date of conviction or release from confinement, "[e]vidence of the conviction is admissible only if its probative value supported by specific facts and circumstances, substantially outweighs its prejudicial effect."  Fed. R. Evid. 609(b)(1).  In addition, "the proponent [must] give[] an adverse party reasonable written notice of the intent to use [the conviction] so that the party has a fair opportunity to contests its use."  Fed. R. Evid. 609(b)(2).

The trial court has broad discretion when deciding when to admit evidence of a defendant's prior conviction.  See United States v. Vasquez, 840 F. Supp. 2d 564, 567 (E.D.N.Y. 2011).  The government must show that the probative value of a conviction outweighs its prejudice. Id.  Courts ordinarily look to the following factors when considering admissibility: "(1) the impeachment value of the crime; (2) the date of the conviction and the defendant's subsequent history; (3) the degree of similarity between the past crime and the charged crime; (4) the centrality of the credibility issue; and (5) the importance of the defendant's testimony."  United States v. Thomas, 214 F. Supp. 3d 187, 195 (E.D.N.Y. 2016) (quoting United States v. Hayes, 553 F.2d 824, 828 (2d Cir. 1997)).  When the fact of a prior conviction is to be admitted, "the presumption is that only the 'essential facts' of the prior conviction—which include 'the statutory name of each offense, the date of conviction, and the sentence imposed'—will be admitted for purposes of impeachment."  United States v. White, 312 F. Supp. 3d 355, 360 (E.D.N.Y. 2018) (quoting Estrada, 430 F.3d at 615-16).

B.    Discussion

Should the defendants testify, their credibility will become a central issue at this trial.  The importance of their testimony and the centrality of their credibility weigh heavily in

50

favor of admission.  The defendants' convictions suggest their willingness to put their interests above those of society.  Moreover, if the defendants testify, the case will turn on whose version of events the jury believes.  Thus, because "the testimony of the defendant will create a credibility contest between [himself] and the government's witnesses," the probative value of the defendant's conviction is increased.  United States v. Guerrier, 511 F. Supp. 3d 556, 565–66 (M.D. Pa. 2021).

After weighing the probative value of the defendants' convictions against their prejudicial effect, should they testify, the government should be permitted to inquire about these convictions so that the jury can fully and fairly assess their credibility.  Castro and Powell's convictions are all within ten years of their possible testimony at this trial so they must be admitted upon a finding that the probative value outweighs its prejudicial effect to the defendants.  See Fed. R. Evid. 609(1)(1)(B).  Three of Coward's convictions are also within this timeframe so they must also be admitted as well.

XII.    Certain Business and Public Records Certifications Are Admissible

At trial, the government intends to introduce the following certified business records: T-Mobile subscriber, toll, and cell-site records; AT&T subscriber, toll, cell tower  and cell-site records; Tracfone subscriber and call detail records; medical records from NYC Health & Hospitals and the Brookdale University Hospital and Medical Center for three non-fatal victims of the shooting at the Gambling Spot; LPR records from New York and New Jersey; New Jersey State Department of Motor Vehicle ("DMV") records for Castro and the Civic; records  from WABC-TV for the ABC News Story; iCloud records from Apple Inc. related to the defendants; Cash App records related to the defendants; records from Amazon Inc. related to Powell; Meta and Snapchat records related to Castro; records from Venmo related to Powell; flight records from Delta Airlines related to Castro; records from New Jersey Supreme Court related to Powell's prior felony convictions; and a birth certificate for Charles Powell.  The underlying certifications, which are

attached hereto as Exhibits 1-15, have already been produced to the defendants in discovery. The government will produce additional certifications as they become available.

As detailed above, the defendants used their cellular telephones leading up to, during and after the shooting at the Gambling Spot. Accordingly, the government intends to introduce at trial the subscriber information, toll records and cell-site data associated with the use of those cellular telephones. The cell site records are relevant to show the defendants' movements from Paterson, New Jersey to Brooklyn and back to Paterson after the murder. Although the phones were not registered in the defendants' individual names, certified records from Cash App, Amazon and Venmo are variously relevant as attribution evidence to link the defendants to those phone numbers and their home addresses. Certified LPR records are relevant to connect the Civic to the commission of the robbery and to demonstrate that they coincided with the defendants' cell site activity in the hours surrounding the murder. Certified records from WABC-TV are relevant to show that the ABC News Story, █████████████████████████████████ is a true and accurate duplicate of the original record in the custody of WABC-TV.

The government also intends to offer certified records from the New Jersey State Department of Motor Vehicle ("DMV") records for Castro, Powell and the Civic, which include, but are not limited to photographs, prior applications including addresses and phone numbers information, and prior address records. The government expects that these records will be relevant to prove co-conspirators' identities, telephone numbers and home addresses.

All of these records were records kept in the ordinary course of business; and the certifications establish that these records are true and complete copies of the records kept in the ordinary course of business. See Fed. R. Evid. 803(6) and 902(11). The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz v. Massachusetts, 557 U.S. 305

(2009).  The Court has explained that "[b]usiness and public records are generally admissible

absent confrontation . . . because— having been created for the administration of an entity's affairs

and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id.

at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have

concluded that certifications authenticating records are not testimonial and therefore are

permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v.

Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81

(10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v.

Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).

As the Seventh Circuit explained in Ellis, an authenticating certification under Rule 902(11) is

"nothing more than the custodian of records . . . attesting that the submitted documents are actually

records kept in the ordinary course of business" and "merely establish the existence of the

procedures necessary to create a business record."  460 F.3d at 927.  It is the underlying records,

not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the

authentication of business records by certification and sets forth specific requirements for their

admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic

business records by certification.  Courts in the Second Circuit have routinely applied these

provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d

151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow

government to offer into evidence foreign business records based upon a certification, absent a live

witness to authenticate the documents).  Similarly, Rule 803(6)(D) provides that a document may

be qualified as a record of a regularly conducted activity "by a certification that complies with Rule

902(11) or (12) or with a statute permitting certification."  Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficiently laid foundation for admission of bank records). Thus, "Rule 902(11) extends Rule 803(6) 'by allowing a written foundation in lieu of an oral one.'" United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013) (summary order) (citing 5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008)).  Likewise, under Federal Rule of Evidence 902(1), domestic public documents are self-authenticating and "require no extrinsic evidence of authority in order to be admitted" so long as they bear "a seal purporting to be that of the United States" or "any state" of the United States" and bear a "signature purporting to be an execution or attestation."

The government should be permitted to authenticate and admit the relevant records referenced above using certifications because it is proper under the law.  The government intends to offer these records at trial under Rules 803(6)(D), 902(1), 902(11) and 902(13) pursuant to the attached certifications that meet the requirements of Rule 803(6)(A)-(C).  See Exs. 1-15.  As noted, the government has provided the defendants, and will continue to provide as they become available, the certifications and underlying business and public records in discovery, and the defendants are hereby informed of the government's intention to offer them as evidence at trial.  Such a process would eliminate unnecessary persons from the courtroom, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York need not travel to New York to appear at trial.  Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating business and public records. Accordingly, the government respectfully requests that the Court admit the above referenced business records at trial pursuant to Rules 803(6)(D), 902(1), 902(11) and 902(13).

XIII.  The Court Should Preclude Any Evidence Introduced by the Defendants Seeking to Elicit
Sympathy

The defendants should be precluded from commenting, introducing, or eliciting any evidence that seeks to elicit sympathy from the jury including, but not limited to, evidence concerning their personal, health, or family circumstances, or evidence of the defendants' good character through specific instances of conduct.

The Court's power to exclude arguments concerning the defendants' personal, health, or family circumstances arises from Rules 401, 402 and 403 of the Federal Rules of Evidence.  The Federal Rules of Evidence also ordinarily prohibit witnesses from proving good character through specific instances of conduct.  See Fed. R. Evid. 405(a).  As stated above, evidence is admissible only if it is relevant—having "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence," Fed. R. Evid. 401(a)—and not otherwise inadmissible, Fed. R. Evid. 402.  Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."  Fed. R. Evid. 403.

"District courts have broad discretion to balance the probative value of evidence against possible undue sympathy or bias as well as prejudice."  United States v. Miller, 641 F. Supp. 2d 161, 167 (E.D.N.Y. 2009).  Courts have broad discretion to exclude evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403, Adv. Comm. Notes.  Indeed, when evidence is of limited probative value, it should be excluded if it has the "potential to engender sympathy in an inappropriate effort to excuse defendant's commission of the charged offenses."  Miller, 641 F. Supp. 2d at 167; see also United States v. Paccione, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming preclusion of evidence that the defendant had son with cerebral palsy); United States v. Battaglia,

No. 05-CR-774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan. 15, 2008) (precluding "evidence of Defendant's family and personal status" as not "relevant to the issue of whether Defendant committed the crimes charged"); United States v. Harris, 491 F.3d 440, 447 (D.C. Cir. 2007) (affirming preclusion of evidence designed "mainly to cast [the defendant] in the sympathetic light of a dedicated family man").

At this time, it is unclear what evidence, if any, the defendants may seek to introduce concerning their personal, health, or family circumstances, or otherwise relating to their good character through specific instances of conduct.  Evidence of the defendant's personal hardships, including purported health issues or family status, has no tendency to make any "facts of consequence" in this case more or less probable.  Such topics simply have no bearing on whether the defendants committed the charged crimes.  Any evidence relating to these topics is irrelevant and, therefore, inadmissible.

Even assuming, arguendo, that the defendants' personal hardships, health, family status, or purported good character had some limited probative value, that value would be far outweighed by the danger of unfair prejudice to the government.  Exclusion is appropriate where the admission of evidence creates "risks which range all the way from inducing decision on a purely emotional basis, at one extreme, to nothing more harmful than merely wasting time, at the other extreme."  Fed. R. Evid. 403, Adv. Comm. Notes.  The prejudice to the government resulting from the admission of evidence or argument regarding this evidence far outweighs any probative value such testimony might have.  Rather, the clear purpose for introducing evidence at trial of these details would be to elicit sympathy for the defendants or distract from the facts at issue.  The risk of juror confusion and unfair prejudice is manifest because the jury would be asked to look past the defendants' conduct in this case.  This sort of emotional appeal to the jury's sympathy should be excluded under Rule 403.  See United States v. Malpeso, 115 F.3d 155, 162-63 (2d Cir.

56

1997) (excluding evidence and precluding argument on issues that had "little or no relevance" to the charged crimes and might encourage jury nullification).

XIV.   The Court Should Preclude Any Evidence Relating to Possible Punishment and Collateral Consequences

The Court should preclude the defendants from mentioning any consequences of their convictions at trial during jury addresses, cross-examination or otherwise.  While the defendants have not suggested that they intend to introduce any discussion of these consequences at trial, out of an abundance of caution, the government moves to preclude at trial any discussion of such evidence.

Evidence regarding possible consequences the defendants may face if convicted should be precluded because it is not relevant.  As stated above, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  The defendants' punishment is not a fact "of consequence" to be determined at trial.  Therefore, any evidence of those issues is not relevant.  See Shannon v. United States, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task.").

Such evidence is not only irrelevant, but it "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion."  Id.  Indeed, jurors are routinely instructed not to consider a defendant's punishment in determining a defendant's guilt.  See generally Sand, et al., Modern Federal Jury Instructions ("Sand"), Instruction 9-1 (2017 ed.); see also Shannon, 512 U.S. at 579 (a jury "should be admonished to reach its verdict without regard to what sentence might be imposed [and] not to consider the consequences of their verdicts . . . ." (internal citation omitted)); United States v. Watts, 934 F. Supp. 2d 451, 464-65 (E.D.N.Y. 2013) ("[I]t is well-established precedent

that jurors should not be informed about the possible consequences of their verdict, due to the likelihood that prejudice, unfairness, and confusion [] would result.").

Courts have routinely precluded evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury. See, e.g., United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences"); United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury"). In short, guilt should determine punishment, not the other way around. See United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that the courts may permit it to occur when it is within their authority to prevent."). Courts have consistently recognized that juries have no right to nullify, and "trial courts have the duty to forestall or prevent such conduct." Id. at 616. Therefore, the Court should preclude the defendants from referencing potential punishment and collateral consequences at trial.

XIV.  The Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits to Be Introduced During Their Case-in-Chief

Consistent with Rule V(E)(1) of the Court's Individual Rules and Practices, the government respectfully request that the Court order the defendants to disclose defense exhibits, including exhibits they intend to introduce through cross-examination of government witnesses, no later than 10 days before jury selection — i.e., on or before December 27, 2024.

58

Federal Rule of Criminal Procedure 16(b) governs a defendant's disclosures in a criminal case. In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A). The Rule's purpose "is to avoid surprise and gamesmanship," and "it definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial." United States v. Hsia, No. 98-CR-0057 (PLF), 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000).

Of course, Rule 16 does not require a defendant to disclose documents he intends to use for purposes of impeaching a government witness (just as Rule 16 does not require the government to disclose documents it intends to use to impeach defense witnesses). But to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief, in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16 and must be produced. As the District Court for the District of Columbia has explained:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense[.] The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

Hsia, 2000 WL 195067, at *2 (quoting Black's Law Dictionary 207 (7th ed. 1999)). The Hsia court distinguished documents introduced by a defendant via a government witness — which do fall within Rule 16 and should be disclosed — from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, [which] is not part of [the defendant's] case-in-chief." Id. at *2 n.1.

59

Courts in this district have repeatedly recognized this distinction, ordering the production of defense exhibits "that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination.  See, e.g., United States v. Cory Martin, No. 20-CR-549 (AMD), ECF Order (E.D.N.Y. Feb. 1, 2024) (ordering disclosure of defense exhibits in murder-for-hire trial seven days prior to jury selection and witness statements, not including the defendant, two days before the witness's testimony); United States v. Smothers, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); see also United States v. Warren, No. 22-CR-231 (DLI), ECF Order (E.D.N.Y. Sept. 6, 2023) (ordering disclosure of defense exhibits in felon-in-possession trial six days prior to jury selection); United States v. Thorpe, No. 19-CR-492 (HG), Pretrial Conference Tr. 41 (E.D.N.Y. Aug. 23, 2023) (granting government's motion for disclosure of Rule 16 discovery and defense exhibits two weeks before trial, explaining, "It's not only exhibits that you would introduce if you called a witness, but it's exhibits that you know you're going to introduce through, let's say, the case agent.  It's not only what you're going to put on once the Government says, 'the Government rests.'"); United States v. Napout, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant.").  That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit.  See Smothers, 2023 WL 348870, at *22 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody").

Numerous other district courts outside of this District have interpreted Rule 16(b) similarly.  See United States v. Swenson, 298 F.R.D. 474, 477 (D. Idaho 2014) ("Defendants have a duty to produce any exhibits they intend to use at trial during cross-examination of a government

witness other than for impeachment purposes."); United States v. Holden, No. 13-CR-444 (AJB), 2015 WL 1514569, at *4 (D. Or. Mar 19, 2015) (holding, based on Swenson and Hsia, that a defendant must disclose non-impeachment substantive evidence that the defendant seeks to use in examination of government or defense witnesses); United States v. Larkin, No. 12-CR-319 (GWF), 2015 WL 4415506, at *5 (D. Nev. July 20, 2015) (stating that the approach adopted in Holden, Swenson, and Hsia is "consistent with the structure and integrity of Rule 16(b) as a whole"); United States v. Aiyaswamy, No. 15-CR-568 (LHK), 2017 WL 1365228, at *5 (N.D. Cal. Apr. 14, 2017) (same).

Here, the government has requested the defendants' Rule 16 materials in discovery letters; to date, the defendants have not disclosed anything. The defendants' failure to provide reciprocal discovery may be a result of having none to produce; they may not intend to introduce any evidence at trial, as is their right. The defendants, however, cannot rely upon an undefined defense strategy to avoid producing documents in compliance with the spirit and letter of Rule 16 and the Court's Individual Rules.

Accordingly, to avoid gamesmanship, unfair surprise and undue delay during the trial, the government respectfully requests that the Court order the defendants to identify any defense exhibits they intend to introduce during the government's case (but not those documents to be used for impeachment purposes only) or any defense case no later than December 27, 2024, ten days before jury selection.

The government further respectfully submits that, to avoid gamesmanship and delay during the trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendants. See Fed. R. Crim. P. 26.2. The government proposes that the Court order that government and defense Rule 26.2 materials be exchanged simultaneously on a date agreed-upon by the parties or, if necessary, set by the Court. See United States v. Boustani,

No. 18-CR-681 (WFK), ECF No. 120 at 1-2 (E.D.N.Y. July 31, 2019) (ordering simultaneous exchange of Rule 26.2 material).

Finally, to avoid any unnecessary objections or delays during opening statements, the government respectfully requests that the Court order that the parties mutually exchange any demonstratives each party intends to use during opening statements no later than January 6, 2025. See United States v. Aguilar, No. 20-CR-390 (ENV), ECF No. 238 at 1-2 (E.D.N.Y. Jan. 2, 2024) (ordering exchange of opening-statement demonstratives after completion of jury selection). The government respectfully submits that such demonstratives should not include any exhibits, as exhibits generally may not be shown to the jury during opening statements. See id. at 1 ("Aguilar may not during his opening statement show or reference by exhibit number exhibits marked for use at trial."); Williams v. Vahey, No. 20-CV-2560 (KAM), 2023 WL 130834, at *1 (E.D.N.Y. Jan. 8, 2023).

<div align="center">CONCLUSION</div>

For the foregoing reasons, the Court should grant the government's motions in limine in their entirety.

Dated:     Brooklyn, New York
           December 6, 2024

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Andrés Palacio
Megan Larkin
Raffaela S. Belizaire
Assistant United States Attorneys
       (Of Counsel)